**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>GRANT GOSCH and<br>TINA GOSCH,<br><br>Debtors. | Bankruptcy Case No. 20-13871 TBM<br>Chapter 13 |

---

**MEMORANDUM OPINION AND ORDER OVERRULING SUBSTANTIVE**
**CONFIRMATION OBJECTIONS TO THIRD CHAPTER 13 PLAN**

---

### I.      Introduction.

Chapter 13 of the Bankruptcy Code[1] "affords individuals receiving regular income an opportunity to obtain some relief from their debts while retaining their property." *Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1690 (2015).  The *quid pro quo* is a Chapter 13 plan.  A debtor must propose and obtain Court approval of a "plan under which [the debtor] pay[s] creditors out of . . . *future income*."  *Hamilton v. Lanning*, 560 U.S. 505 (2010) (emphasis added).  Under Section 1325(b), a debtor's Chapter 13 plan cannot be confirmed over the objection of a Chapter 13 trustee or creditor unless the plan provides for the debtor either to pay all claims in full or commit "all of the debtor's *projected disposable income*" to Chapter 13 plan payments over a period between three and five years.  It is a very tough bargain — the vast majority of Chapter 13 cases fail.

In this bankruptcy proceeding, the Debtors, Grant Gosch and Tina Gosch (together, the "Debtors") proposed a Chapter 13 plan.  The Chapter 13 Trustee, Adam Goodman (the "Chapter 13 Trustee") objected, contending that the Debtors were improperly shielding from creditors money that the Debtors received on the very eve of bankruptcy for personal injuries suffered by Tina Gosch in an automobile crash.  The Chapter 13 Trustee argued that some or all of the personal injury funds must be committed by the Debtors as "projected disposable income" for the benefit of their creditors.  He also alleged that the Debtors had not proposed their Chapter 13 plan in good faith.  The Debtors contested each of the objections.

The Court ultimately concludes that the personal injury funds received by the debtors prior to their bankruptcy petition (during a "gap" period) need not be contributed to creditors as "projected disposable income."  Instead, under the particular circumstances of this case, the Debtors may retain the personal injury funds as their exempt asset.  The

---

[1]      All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

Court also determines that the Debtors proposed their Chapter 13 plan in good faith. Accordingly, the Debtors' Chapter 13 plan may be confirmed after correcting a minor discrepancy.

## II.   Jurisdiction and Venue.

This Court has jurisdiction to enter final judgment on the issues presented in this bankruptcy case pursuant to 28 U.S.C. § 1334.  The plan confirmation dispute is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), (b)(2)(L) (confirmation of plans), and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.   Procedural and Factual Background.

## A.   The Bankruptcy Filing and Identification of the Personal Injury Funds.

The Debtors filed for protection under Chapter 13 of the Bankruptcy Code on June 5, 2020.  (Docket No. 1.)[2]  The same day, they filed their Schedules.  (*Id.*)  On Schedule A/B Part 4, they identified as an asset a "Savings Account at Key Bank" in the amount of $46,595.45.  (*Id.*)  The Debtors added an additional description:

> Settlement funds in the amount of $23,616.97 for Tina and $22,978.48 designated for future medical expenses related to injuries from a motor vehicle accident.

(*Id.*)  For ease of reference, the Court refers to this $46,594.45 asset as the "Personal Injury Funds."  The Debtors and the Chapter 13 Trustee stipulated that the Personal Injury Funds were received by the Debtors on June 1, 2020 — just four days before they filed for bankruptcy.  The Personal Injury Funds have not been used by the Debtors. Instead, the Personal Injury Funds remain segregated in the Debtors' bank account.

## B.   The Exempt Nature of the Personal Injury Funds.

On their Schedule C, the Debtors claimed the Personal Injury Funds as exempt under COLO. REV. STAT. § 13-54-102(1)(n).  (Docket No. 1.)  That statute states:

> The following property is exempt from levy and sale under writ of attachment or writ of execution . . . the proceeds of any claim for damages for personal injuries suffered by any debtor except for obligations incurred for treatment of any kind for such injuries or collection of such damages.

COLO. REV. STAT. § 13-54-102(1)(n).

---

[2]   The Court will use the convention "Docket No. ___" to refer to a document filed in the CM/ECF file for this Bankruptcy Case.

A few months after the commencement of the bankruptcy case, the Chapter 13 Trustee filed an "Objection to Claimed Exemption in Property," wherein the Chapter 13 Trustee contested the Debtors' claim of exemption in the Personal Injury Funds. (Docket No. 18, the "Exemption Objection.") The Debtors opposed the Exemption Objection and insisted that the Personal Injury Funds were exempt. (Docket No. 20.) The Court conducted a hearing on the Exemption Objection. (Docket No. 38.) Thereafter, the Chapter 13 Trustee and the Debtors submitted additional legal briefing on the contested exemption issues. (Docket Nos. 40 and 41.)

On January 5, 2021, the Court issued an Oral Ruling on the Exemption Objection followed by a confirming Minute Order. (Docket No. 62.) Therein, the Court "DENIED the Chapter 13 Trustee's Exemption Objection and sustained the Debtors' claim of exemption in the [Personal Injury Funds] in the amount of $46,595.[45]." (*Id.*) Neither the Chapter 13 Trustee nor the Debtors appealed. Thus, the Court already has conclusively determined that the Personal Injury Funds are exempt property of the Debtors under COLO. REV. STAT. § 13-54-102(1)(n).

## C.    <u>The Early Chapter 13 Plan Confirmation Process</u>.

Contemporaneously with their bankruptcy filing, the Debtors also submitted their initial Chapter 13 Plan. (Docket No. 2, the "First Chapter 13 Plan.") In the First Chapter 13 Plan, the Debtors did not commit the Personal Injury Funds toward the payment of their creditors. Instead, the Debtors limited the source of their proposed Chapter 13 plan payments to their monthly net income from their current jobs as shown on their Schedules I and J. (Docket No. 1.) The Chapter 13 Trustee objected to confirmation of the Debtors' First Chapter 13 Plan on a variety of grounds. (Docket No. 14.) Among other things, the Chapter 13 Trustee asserted that:

> The Chapter 13 Plan fails to provide that all net proceeds from the Debtors' [Personal Injury Funds] will be paid to the Trustee for distribution to allowed unsecured claims, as required by 11 U.S.C. §§ 1325(a)(3), 1325(a)(4), and 1325(b).

(*Id.* ¶ 9.)

The Debtors filed an Amended Chapter 13 Plan to resolve most of the objections. (Docket No. 27, the "Second Chapter 13 Plan.") However, in the Second Chapter 13 Plan, the Debtors still did not propose to use the Personal Injury Funds to pay creditors. So, the Chapter 13 Trustee contested the Second Chapter 13 Plan. (Docket No. 32.) The Chapter 13 Trustee again made the same objection pertaining to the Debtors' treatment of the Personal Injury Funds. (*Id.* ¶ 6.) The Court set an evidentiary hearing to resolve the confirmation issues. (Docket No. 38.) However, the day before the scheduled evidentiary hearing on the Second Chapter 13 Plan, the Court ruled (as set forth above) on the Exemption Objection, determining that the Personal Injury Funds were exempt property of the Debtors. As a result, the Chapter 13 Trustee and the Debtors suggested that the hearing on the Second Chapter 13 Plan should be vacated and the

Debtors permitted an opportunity to submit a further amended Chapter 13 plan. (Docket No. 62.) The Court concurred. (*Id*.)

## D.    The Third Chapter 13 Plan.

So, the Debtors filed another Amended Chapter 13 Plan. (Docket No. 64, the "Third Chapter 13 Plan.") The Third Chapter 13 Plan is the most recent and operative Chapter 13 plan. In the Third Chapter 13 Plan, the Debtors made some modest changes but still did not propose to use the Personal Injury Funds to pay creditors. Instead, the Debtors proposed to pay: (1) two payments of $1,822.00; (2) four payments of $1,260.00; and (3) 54 payments of $1,575.00. (*Id*.) Adding it all up, the Debtors proposed to pay a total of $93,734.00 from their future employment earnings over the 60-month plan period. Of this amount, they proposed to allocate: $16,000.00 for unpaid attorneys' fees; $3,657.00 for delinquent federal and state taxes; $37,765.71 for car loans; $9,373.40 for Chapter 13 Trustee fees; and $34,937.89 for general unsecured creditors.[3] (*Id*.) General unsecured creditors (mostly credit card companies) filed proofs of claim totaling $144,297.14. (*See* Claims Register.)[4] Bottom line, the Debtors propose to pay general unsecured creditors about 24% of their claims over five years.

## E.    The Debtors' Financial Information Relevant to Plan Confirmation.

Congress requires debtors seeking bankruptcy protection to promptly file a welter of forms providing fulsome financial disclosure, including a "schedule of current income and current expenditures," a "statement of the amount of monthly net income," and a "statement disclosing any reasonably anticipated increase in income or expenditures over the 12-month period following the date of the filing of the petition," all as "prescribed by the appropriate Official Forms." 11 U.S.C. §§ 521(a)(1)(B)(ii), (v), and (vi); *see also* FED. R. BANKR. P. 1007(b)(1)(B). Official Forms 106I and 106J embody such requirements.

Official Form 106I (commonly referred to simply as "Schedule I") is titled "Your Income" and asks the debtor (or two debtors in the event of a joint bankruptcy filing) to "describe employment" by listing current employment status and occupation. Then, Schedule I requires "details about monthly income," including estimates of current income based upon "gross income" minus payroll deductions. In a joint filing, the result is "combined monthly income." Schedule I is not based upon past income history. Instead, it is a current snapshot. The Debtors submitted an Amended Schedule I. (Docket No. 47.) The Debtors started by listing their combined "gross income": $8,605.23. (*Id*.) Then, they subtracted payroll deductions and identified their "combined monthly income" as

---

[3]    There is a discrepancy regarding payments to general unsecured creditors. In Section 3.1D of the Third Chapter 13 Plan, the Debtors state that they propose to pay general unsecured creditors $26,937.89. But in Section 3.2C of the Third Chapter 13 Plan, the Debtors indicate they will actually pay unsecured creditors $34,937.89. The Court understands that the first number is an error and the Debtors really propose to pay $34,937.89 to general unsecured creditors.

[4]    The Chapter 13 Trustee asserted that "non-priority unsecured claims filed in this case total $143,503.14." (Docket No. 66 at 1.) The Court's calculation is $144,297.14. So, there is a $794.00 discrepancy. The Court has been unable to identify the reason for the difference. Perhaps there is a mathematical error. However, the slight difference in the amount of general unsecured claims is not material to the Court's decision. The main point is that there is a large pool of general unsecured claims.

$5,964.91. (*Id.*) The Debtors stated that they did not expect "an increase or decrease" for the next year. (*Id.*) And, in identifying their "combined monthly income," the Debtors did not interject the Personal Injury Funds into the equation.

Official Form 106J (commonly-referred to simply as "Schedule J") is titled "Your Expenses" and asks the debtor (or two debtors in the event of a joint bankruptcy filing) to list "ongoing monthly expenses" in about two dozen categories such as housing, utilities, food, clothing, transportation, childcare, medical expenses, and the like. Then Schedule J requires a mathematical calculation for "monthly net income." Debtors are supposed to take their "combined monthly income" from Schedule I and then subtract "monthly expenses" from Schedule J resulting in "combined monthly net income." The Debtors did that. They submitted an Amended Schedule J. (Docket No. 47.) They listed their "monthly expenses" as $4,389.91. (*Id.*) They subtracted that amount from the "combined monthly income" on Schedule I and calculated $1,575.00 as their "monthly net income." (*Id.*). The Debtors stated that they did not expect "an increase or decrease" in expenses for the next year. (*Id.*) In the Chapter 13 context, the Schedule J "monthly net income" calculation is a measure of feasibility and, if accurate, shows what debtors realistically can pay creditors based upon their current circumstances. The Debtors apparently utilized that number ($1,575.00) as a basis for the proposed payments under the Third Chapter 13 Plan.

Conceptually, all the foregoing is fairly intuitive. But bankruptcy has its own confusing jargon. In addition to requiring all bankruptcy debtors to identify their "monthly net income" on Schedules I and J, the Bankruptcy Code also mandates that Chapter 13 debtors file a "statement of current monthly income, prepared as prescribed by the appropriate Official Form" and, for above-median-income debtors, "a calculation of disposable income made in accordance with § 1325(b)(3), prepared as prescribed by the appropriate Official Form . . . ." FED. R. BANKR. P. 1007(b)(6). Official Forms 122C-1 and 122C-2 embody such requirements. And, these forms are necessary for analyzing a Chapter 13 plan for confirmation under Sections 1325(b)(1)(b) and 1325(b)(2) which also use the terms "current monthly income" and "disposable income."

Notably, and somewhat counter-intuitively for those uninitiated to the world of bankruptcy, the term "current monthly income" used in Section 1325(b)(2) and FED. R. BANKR. P. 1007(b)(6) — which the Court refers to by the common shorthand acronym "CMI" — is not the same as the strikingly similar term "combined monthly income" used on Schedule I, Line 12. In fact, despite the use of the word "current" in CMI, CMI actually is not current at all. It seems a bit misleading, but CMI is a statutorily defined term consisting of only *past* monthly income during the six-month period preceding the bankruptcy filing. 11 U.S.C. § 101(10A). And, "disposable income" as used in Section 1325(b)(2) and FED. R. BANKR. P. 1007(b)(6) also is backward-looking, not current.

In any event, as mandated, the Debtors submitted their amended: (1) "Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period: Official Form 122C-1" (Docket No. 76, "Form 122C-1"); and (2) "Chapter 13 Calculation of Your Disposable Income: Official Form 122C-2" (Docket No. 76, "Form 122C-2"). As set forth on the Form 122C-1, the Debtors calculated a past "average monthly income" of

$8,894.02.  (Docket No. 76.)  That amount of income is higher than most Colorado debtors of similar household size, so, the Debtors are characterized as "above-median-income" debtors who must make Chapter 13 plan payments for 60 months.  In making that calculation, the Debtors did not include any part of the Personal Injury Funds as income.  Then, on Form 122C-2, the Debtors subtracted certain deductions and expenses using Internal Revenue Service National Standards, Local Standards, and expense allowances.  (*Id*.)  They ended the initial exercise by calculating "monthly disposable income under § 1325(b)(2)" as $1,974.00.  (*Id*.)

## F.  **The Chapter 13 Trustee's Objection to the Third Chapter 13 Plan**.

The Chapter 13 Trustee objected to the Third Chapter 13 Plan, contending that the Debtors must pay more than the proposed $93,734.00 over the 60-month plan period.  (Docket No. 66.)  There are three objections.  The Chapter 13 Trustee's main objection is with respect to the Personal Injury Funds and the Debtors' "projected disposable income."  Summarizing his argument, the Chapter 13 Trustee asserted:

> Debtors do not propose to pay their creditors in full through their Chapter 13 Plan and propose to retain the $46,594.45 in personal injury settlement funds, without turnover of any portion of those funds for payment to their creditors.  The Trustee objects to confirmation of the Chapter 13 Plan, as it fails to provide that all net proceeds of personal injury settlement funds will be paid to the Trustee for distribution to allowed unsecured claims, as required by 11 U.S.C. §§ 1325(a)(3) and 1325(b).

(*Id*.)  The Court refers to the foregoing objection as the "Personal Injury Funds Objection."  Secondarily, the Chapter 13 Trustee also complains that the Debtors' Third Chapter 13 Plan was not proposed in good faith as required by Section 1325(a)(3).  (*Id*.)  The Court refers to such objection as the "Good Faith Objection."  Finally, the Chapter 13 Trustee objected on the basis that the Third Chapter 13 Plan "is internally inconsistent with respect to payment of [general unsecured] claims, in that Line 3.2(C) indicates Class Four creditors will receive $34,937.89 but the [Second Chapter 13 Plan] only funds $26,937.89 for Class Four on Line 3.1(D)."  (*Id*. at 1.)  The Court refers to the foregoing objection as the "Discrepancy Objection."

The Court conducted a preliminary confirmation hearing on the contested Third Chapter 13 Plan.  (Docket No. 77.)  At the hearing, the Chapter 13 Trustee and the Debtors agreed that the Court should decide the Personal Injury Funds Objection and Good Faith Objection as threshold matters while reserving the Discrepancy Objection.  More specifically, the parties suggested that the Court should decide whether, as a matter of law, the Debtors were required to commit any part of the exempt Personal Injury Funds to the payment of creditors as part of the Debtors' "projected disposable income."  According to the parties, if the Court decides that none of the Personal Injury Funds must be included as part of the Debtors' "projected disposable income," then, the Personal Injury Funds Objection and Good Faith Objection would be fully resolved and the remaining Discrepancy Objection to the Third Chapter 13 Plan could be cured in a further

6

amended Chapter 13 Plan.  However, the parties contend that if the Court determines that some portion of the exempt Personal Injury Funds must be included as part of the Debtors' "projected disposable income," then, in that event, the Court should conduct an evidentiary hearing to decide the specific amount of the Personal Injury Funds that must be paid to creditors after taking into account additional facts concerning the Debtors' anticipated future medical expenses.

Effectively, the Chapter 13 Trustee and the Debtors ask for a threshold legal ruling which may potentially vitiate the need for a further evidentiary hearing or at least narrow the issues.  The parties contend that such approach will avoid the expenditure of additional time and resources.  As a general matter, the Court is reticent to engage in piecemeal decisions.  However, the Court ultimately concurs that the staged path suggested by the parties makes sense in the unique circumstances of this dispute.  Deciding the threshold legal issues likely will be more efficient and economical for all parties in interest.

**G.**   **The Facts.**

While the Chapter 13 Trustee and the Debtors have characterized the threshold Personal Injury Funds issues as "primarily legal," the Court cannot decide any issues in a vacuum and instead must have facts.  Toward that end, the parties have stipulated that the Court should consider: (1) the Debtors' Petition, Statement of Financial Affairs, Schedules (including Schedules I and J), most-recent Official Forms 122C-1 and C-2, and Claims Register; (2) the "Joint Stipulation of Facts" submitted by the parties (Docket No. 58); and (3) the parties' stipulation that the Debtors received the Personal Injury Funds on June 1, 2020.  Based upon the agreement of the parties, the Court considers the foregoing as the uncontested fact set to be used for deciding the threshold Personal Injury Funds Objection.  Most of such facts have been described above already.

## IV.   Legal Analysis.

The Court will decide whether, as a matter of law, any part of the exempt Personal Injury Funds must be committed to pay creditors as part of the Debtors' "projected disposable income" under Sections 101(10A), 1325(b)(1)(B), and 1325(b)(2).  That difficult question involves at least three discrete legal issues: (1) an initial timing issue; (2) an adjustments issue; and (3) an exemption issue.  The timing issue focuses on the fairly unusual circumstance that the Debtors received the Personal Injury Funds just four days before they filed for bankruptcy protection and after the end of the month preceding their bankruptcy filing.  The question is whether the Personal Injury Funds must be included as part of the initial "disposable income" calculation under Sections 1325(b)(1)(B) and 1325(b)(2) given that the Debtors received the Personal Injury Funds right before filing their bankruptcy but during a "gap period" created by the statute.  The adjustments issue requires the Court to consider whether it should approve any adjustments to the initial "disposable income" calculation for purposes of determining "projected disposable income."  The exemption issue centers on whether exempt property (such as the Personal Injury Funds) must be included as part of Section 1325(b)(1)(B) "projected disposable income" for purposes of Chapter 13 plan confirmation.  Finally, if the Debtors prevail on the "projected disposable income" issues, the Court will decide whether the

Debtors' election not to commit the Personal Injury Funds in payment of their creditors constitutes lack of good faith under Section 1325(a)(3).

**A.      General Statutory Framework and Burden of Proof.**

In contrast to Chapter 7 liquidation, Chapter 13 of the Bankruptcy Code "allows a debtor to retain his property if he proposes, and gains court confirmation of, a plan to repay his debts over a three- to five-year period." *Harris v. Viegelahn*, 135 S. Ct. 1829, 1835 (2015). Under Section 1322(a)(1), a Chapter 13 plan must "provide for the submission of all or such portion of *future earnings* or other *future income* of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan." 11 U.S.C. § 1322(a)(1) (emphasis added).

In relevant part, Section 1325(a) mandates that the court "shall confirm a plan" if:

> (1)      the plan complies with the provisions of this chapter and with the other applicable provisions of this title;
> . . . .

> (3)      the plan has been proposed in good faith and not by any means forbidden by law; [and]

> (4)      the value . . . of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date . . . .[5]

11 U.S.C. § 1325(a)(1), (3) and (4).

Section 1325(b)(1) is triggered if there is an objection to confirmation and states:

> If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan —

> (A)      the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

> (B)      *the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.*

---

[5]      Section 1325(a) also contains other confirmation requirements not at issue in this dispute.

11 U.S.C. § 1325(b)(1)(A) and (B) (emphasis added).  Stated in plain English, "if a contested Chapter 13 plan does not provide for a 100% distribution on unsecured creditors' claims [and there is an objection], the plan must provide 'that all of the debtor's projected disposable income to be received in the applicable commitment period . . . will be applied to make payments to unsecured creditors under the plan.'"  *In re Trobiano*, 532 B.R. 355, 358 (Bankr. D. Colo. 2015) (ellipses in original) (citing 11 U.S.C. § 1325(b)(1)(B) and *In re Williams*, 394 B.R. 550, 562 (Bankr. D. Colo. 2008)).

With regard to evidentiary burdens in confirmation contests, the Debtor bears the burden of proving the required elements of Section 1325.  *In re Styerwalt*, 610 B.R. 356, 368 (Bankr. D. Colo. 2019); *In re Melendez*, 597 B.R. 647, 657-58 (Bankr. D. Colo. 2019); *In re Vinger*, 540 B.R. 782, 786 (Bankr. D. Colo. 2015); *In re McDonald*, 508 B.R. 187, 205 (Bankr. D. Colo. 2014).  The legal standard is the preponderance of the evidence.  *In re Fassi*, 2013 WL 2190158, at *1 (Bankr. D. Colo. May 21, 2013) (citing *Ho v. Dowell (In re Ho)*, 274 B.R. 867, 883 (9th Cir. BAP 2002)).

## B.    <u>The Personal Injury Funds Objection</u>.

In the Personal Injury Funds Objection, the Chapter 13 Trustee asserts that the Debtors' Third Chapter 13 Plan fails to commit "all of the debtor's projected disposable income" for the five-year commitment period in contravention of Sections 1325(b)(1)(B) and (b)(2) because the Debtors propose to keep their pre-petition asset:  the Personal Injury Funds.

Understanding the phrase "projected disposable income" is key to unlocking the confirmation puzzle and the Personal Injury Funds Objection.  So, what does "projected disposable income" really mean?  The answer requires a detour through some dizzying statutory cross-references.  The Bankruptcy Code does not define "projected disposable income," but, under Section 1325(b)(2), the shorter term "disposable income" means:

> (2)    . . . *current monthly income* received by the debtor (other than payments made under Federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the coronavirus disease 2019 (COVID-19), child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended —
>
> (A) (i)  for the maintenance or support of the debtor that first becomes payable after the date the petition is filed; and

> (ii)    for [qualified] charitable contributions . . .  in an
> amount not to exceed 15 percent of gross income of
> the debtor for the year in which the contributions were
> made . . . . and

> (B) if the debtor is engaged in business, for the payment of
> expenditures necessary for the continuation, preservation,
> and operation of such business . . . .

11 U.S.C. § 1325(b)(2) (emphasis added.)  That definition is based upon the term "current monthly income" or CMI, which itself is expressly defined and backward-looking rather than "current."  Section 101(10A) states that "current monthly income" means

> . . . the average monthly income from all sources that the
> debtor receives . . . derived during the 6-month period ending
> on — (i) the last day of the calendar month immediately
> preceding the date of the commencement of the case . . . .

11 U.S.C. § 101(10A).  This six-month period under Section 101(10A) sometimes is referred to as the "CMI period" or the "lookback period."  *Lanning*, 560 U.S. at 510 (using the term "lookback period").

On the income side, in Chapter 13 cases, debtors file a Form 122C-1 "Statement of Current Monthly Income" wherein they are required to calculate their average monthly income based on the six-month period before bankruptcy (ending on the last day of the calendar month immediately preceding the petition date), thereby identifying their CMI. The expense side is even more complicated.  Below-median-income debtors calculating "disposable income" may subtract from "current monthly income" "amounts reasonably necessary to be expended . . . for the maintenance or support of the debtor . . . ." 11 U.S.C. § 1325(b)(2)(A)(i).  This often equates with actual expenses.  However, Congress imposed different expense limitations for above-median-income debtors. Above-median-income debtors calculating "disposable income," may subtract from "current monthly income" only specified expenses generally based upon Internal Revenue Service National and Local Standards.  11 U.S.C. §§ 707(b)(2) and 1325(b)(3).  As explained by the Supreme Court in *Lanning*, "the formula for above-median-income debtors is known as the 'means test' and is reflected in a schedule [(Form 122C-2)] that a Chapter 13 debtor must file."  *Lanning*, 560 U.S. at 510 n.2.  Put another way, "Section 707(b)(2), commonly known as the 'means test,' sets out a structured method of calculating reasonably necessary expenses that is designed to reduce the discretion of bankruptcy courts and to ensure that [above-median-income] debtors pay more to their unsecured creditors."  *McCarty v. Lasowski (In re Lasowski)*, 575 F.3d 815, 818 (8th Cir. 2009).  Because the Debtors are above-median-income debtors, their "projected disposable income" calculation does not use the Debtors' actual expenses.  Instead, the Debtors' expenses must be determined generally based upon Internal Revenue Service National and Local Standards in accordance with Section 707(b)(2) and listed on Form 122C-2.

To state the obvious, the various bankruptcy definitions and forms create interpretative difficulties. But the Supreme Court solved the statutory Rubik's cube — at least in part — in *Lanning*, 560 U.S. 505. In that case, an above-median-income debtor received a large "one-time buyout" from her employer during the six-month period ending on the last day of the calendar month immediately preceding the petition date. The payment greatly inflated her "current monthly income" or CMI since such calculation is based upon the six-month lookback period under Section 101(10A) as also reflected on Form 122C-1. The debtor proposed a realistic Chapter 13 plan without counting the "one-time buyout." But, the Chapter 13 trustee objected and argued for a simple "mechanical approach" to "projected disposable income," contending that the debtor was required to use only the inflated and backward-looking CMI figure, subtract expenses, and then multiply that resulting "disposable income" figure (as listed on Form 122C-2) by the 60-month plan term. The result of that approach would have yielded a very high "projected disposable income" amount which all the parties agreed the debtor could not pay going forward. The debtor countered that argument by offering a more flexible "forward-looking approach" under which the "disposable income" shown on Form 122C-2 would serve as a starting point. However, the debtor contended that the "mechanical" computation should be adjusted "where significant changes in a debtor's financial circumstances are known or virtually certain." *Id*. at 513.

In an 8-1 decision, the Supreme Court adopted the "forward-looking approach" and ruled:

> The arguments advanced in favor of the mechanical approach [for projected disposable income] are unpersuasive . . . .
>
> As the Tenth Circuit recognized in this case, *a court taking the forward-looking approach should begin by calculating disposable income, and in most cases, nothing more is required. It is only in unusual cases that a court may go further and take into account other known or virtually certain information about the debtor's future income or expenses.*

*Id*. at 519 (emphasis added).

### 1.   <u>The Timing Issue</u>.

This case is more complicated than the *Lanning* scenario, because the Debtors received the Personal Injury Funds during a "gap period" between May 31, 2020, and June 5, 2020. The starting place for calculating "projected disposable income" is to calculate CMI under Section 101(10A), which requires debtors to compute the "average monthly income from all sources that the debtor receives . . . derived during the 6-month period ending on — (i) the last day of the calendar month immediately preceding the date of the commencement of the case . . . ." Congress did not end the CMI period on the date of the bankruptcy filing.

A few examples illustrate the timing anomaly caused by Section 101(10A). Suppose a debtor filed for bankruptcy protection on January 1, 2020. In that event, the CMI calculation would be based on income the debtor received during the six-month period from July 1, 2019 to December 31, 2019. That would be very similar to ending on the January 1, 2020 bankruptcy petition date. On the other hand, suppose a debtor filed for bankruptcy protection much later in the same month: on January 30, 2020. In that circumstance, the CMI calculation would be based on income the debtor received during the exact same six-month period from July 1, 2019 to December 31, 2019. So, applying the statutory formula, the CMI arguably misses income received by the debtor from January 1, 2020 to January 30, 2020. There is a "gap" which the Court refers to as the "CMI-gap." And, Section 101(10A) contains no express "true-up" mechanism dictating what happens to income received in the usually short interval between the end of the CMI period and a bankruptcy filing.

This is a CMI-gap case. The Debtors filed for bankruptcy protection on June 5, 2020. So, they calculated CMI based on the period from December 1, 2019 to May 31, 2020. That is precisely what they were required to do by Section 101(10A). On their Form 122C-1, they listed "total average monthly income" of $8,894.02. Notably, the Debtors did not include the Personal Injury Funds as income since, among other things, the Personal Injury Funds were not received during the six-month period from December 1, 2019 to May 31, 2020.[6] Then, on their Form 122C-2, the Debtors subtracted deductions and expenses arriving at initial "monthly disposable income under § 1325(b)(2)" (before adjustments) of $1,974.00. The Chapter 13 Trustee concedes that the Forms 122C-1 and 122C-2 are technically accurate for the six-month period from December 1, 2019, to May 31, 2020. He states: "[a]s the Debtors received the [Personal Injury] settlement funds on June 1, 2020, the funds were received outside of the CMI calculation period." (Docket No. 66 at 2.)

Notwithstanding, the Chapter 13 Trustee seems at least to imply that the Court should ignore the timing issue and consider the Personal Injury Funds as part of CMI. (Docket No. 40) ("net proceeds from a personal injury settlement are considered disposable income and required to be committed to the Chapter 13 plan"); (Docket No. 66 at 3) (". . . the [Personal Injury] funds should be considered in the determination of the calculation of the Debtors' projected disposable income and ability to repay their creditors"). In contrast, the Debtors think they did it right in terms of CMI, "disposable income," and Forms 122C-1 and 122C-2. They highlight the "timing of receipt of the exempt funds." (Docket No. 67 at 7.) They correctly note that "the Debtors received the [Personal Injury] Funds pre-petition and outside of the 'applicable commitment period.'" (*Id.* at 8.) And, they contend that the Personal Injury Funds "are not a future source of income." (Docket No. 41 at 11.)

The initial timing issue is unusual. If the Personal Injury Funds had been received by the Debtors during the CMI period (from December 1, 2019 to May 31, 2020), then Section 1325 would require that the Personal Injury Funds be included in the Debtors'

---

[6]     The Debtors also contend that the Personal Injury Funds should be excluded as part of "current monthly income" and "projected disposable income" because the Personal Injury Funds are exempt under COLO. REV. STAT. § 13-54-102(1)(n).

CMI and "disposable income" calculations on Forms 122C-1 and 122C-2.[7]  Section 101(10A) and Forms 122C-1 and 122C-2 dictate that result.  After all, the Personal Injury Funds are "income" because they were a payment received by the Debtors.

But, the Debtors received the Personal Injury Funds in the CMI-gap period.  So, then what?  Neither the Chapter 13 Trustee nor the Debtors have pointed the Court to much authority about this unusual circumstance.  This Court's decision in *Styerwalt*, 610 B.R. 356, seems like the most analogous case albeit the CMI-gap issue was really a minor topic in that dispute.  In *Styerwalt*, the debtor filed for bankruptcy protection on February 25, 2019, so the six-month period under Section 101(10A) was from August 1, 2018 to January 31, 2019.  However, in the CMI-gap period (on February 15, 2019), the debtor received a $7,932.00 bonus.  In *Styerwalt*, the Court concluded that the bonus "paid before the bankruptcy petition date, but not during the statutory 6-month look-back period" was "correctly excluded" from the "currently monthly income calculation." *Styerwalt*, 610 B.R. at 371.  And, the Court also decided that the bonus received "before the bankruptcy petition" was not "'projected' or future income" either.  *Styerwalt*, 610 B.R. at 371 n.11.

The Court follows the *Styerwalt* result again.  Based upon a plain reading of Section 101(10A), the Personal Injury Funds were not received by the Debtors during the CMI lookback period.  So, they are not part of the Debtors' CMI.  Form 122C-1 is based upon the CMI lookback period too.  There was no requirement that the Debtors list the Personal Injury Funds as CMI on Form 122C-1.  It follows that the Debtors did not need to include the Personal Injury Funds as part of "disposable income" on Form 122C-2 either.  The Court recognizes that its conclusion on the timing issue is somewhat anomalous.  However, Congress could quite easily have defined CMI based upon a debtor's gross income for the six-month period ending on the bankruptcy petition date, but did not do so.  Instead, Congress elected to end the CMI period on the last day of the month preceding the bankruptcy petition date.  So, Congress created the CMI-gap.  It is not the Court's role to change or "fix" the statutory scheme even if the result seems strange.  Accordingly, the Court concludes that the Debtors properly calculated their CMI and "disposable income" on Forms 122C-1 and 122C-2 despite the odd timing.

### 2.    The Adjustments Issue.

Per *Lanning,* "projected disposable income" generally is the same as "disposable income" under Section 1325(b)(2) and as listed on Form 122C-2.  *Lanning*, 560 U.S. at 519.  In this case, the Debtors correctly calculated their initial "disposable income" on Form 122C-2 as $1,974.00 (which amount did not include the Personal Injury Funds because they were received outside the CMI period).  (Docket No. 76.)  Usually, "nothing more is required."  *Lanning*, 560 U.S. at 519.  However, "in unusual cases" a court should "go further and take into account other *known or virtually certain information about the debtor's future income or expenses*."  *Id*. (emphasis added).

---

[7]       The Court's conclusion ignores for the moment that the Personal Injury Funds are exempt under COLO. REV. STAT. § 13-54-102(1)(n).  The Court leaves the exemption issue for later.

### a. The Agreed *Lanning* Adjustments.

Both the Chapter 13 Trustee and the Debtors agree that this is an "unusual case[ ]" in which some *Lanning* adjustments are necessary and appropriate.  The Debtors have suffered a decline in income and an increase in expenses since they filed for bankruptcy protection.  On their most-recent Form 122C-2, they identified the following changes:  (1) a decline in income of $288.79 based upon a change in employment; (2) an increase in tax withholding expense of $322.78 based upon a change in employment; (3) an increase in health insurance expense of $460.35 based upon a change in employment; and (4) an increase in retirement deduction expense of $320.00 based upon a change in employment.  (Docket No. 76.)  Summing such amounts yields $1,391.92.  All of the foregoing changes occurred post-petition in July or September 2020.  *(Id.)*  The Debtors propose that their "projected disposable income" should be computed by using the $1,974 identified as their "disposable income" on their Form 122C-2 and then subtracting the $1,391.92 in *Lanning* adjustments, resulting in "projected disposable income" of $582.08.  Importantly, the Chapter 13 Trustee accepts and agrees with all the *Lanning* adjustments proposed by the Debtors.  Accordingly, the Court accepts such agreed adjustments.

### b. The Contested *Lanning* Adjustment.

So far, so good.  But, the Chapter 13 Trustee insists on one more major adjustment, asserting that the change is "known or virtually certain."  He demands that the $46,595.45 in Personal Injury Funds received on June 1, 2020 — during the five-day CMI-gap period — should also somehow be included as part of "projected disposable income."  However, he does not explain exactly how it should be included, leaving the Court to imagine the possibilities.  If the $46,595.45 were to be counted as additional income and then averaged over six months (using the same method as calculation of CMI and "disposable income"), that addition would result in a dramatic increase of $7,765.90 per month (*i.e.*, $46,595.45 ÷ 6 = $7,765.90) in "disposable income."  So, instead of $582.08 in monthly "projected disposable income" based upon the agreed Form 122C-2 "disposable income" and the *Lanning* adjustment above, that figure would suddenly skyrocket to $8,347.98 per month as the new monthly "projected disposable income."  Both the Debtors and the Chapter 13 Trustee concur that the Debtors have absolutely no way to pay such monthly amount to general unsecured creditors during the entire 60-month period of the Debtors' Third Chapter 13 Plan.  The Chapter 13 Trustee has vaguely hinted at other possible alternative ways that the Debtors might be forced to commit the $46,595.45 in Personal Injury Funds.  For example, rather than using the statutory CMI and "disposable income" method, perhaps the Chapter 13 Trustee wants the Debtors to split the $46,595.45 up over the 60-month term of the Debtors' Third Chapter 13 Plan.  Or maybe the Chapter 13 Trustee desires that the Debtors be forced to pay $46,595.45 in a lump sum at confirmation of the Third Chapter 13 Plan.  How the Chapter 13 Trustee's position would actually play out is a bit of a mystery.

Perhaps recognizing the difficulties, the Chapter 13 Trustee concedes that only the "net" amount of the Personal Injury Funds left after payment of the Debtors' anticipated future medical expenses should be included in the "projected disposable income" calculus.  (Docket No. 66.)  After all, the Debtors stated that the Personal Injury Funds

were "designated for future medical expenses related to injuries from a motor vehicle accident." (Docket No. 1.) According to the Chapter 13 Trustee, determining the Debtors' anticipated future medical expenses would require a further evidentiary hearing.

For their part, the Debtors contend that the Personal Injury Funds need not be committed (in part or in whole) as "projected disposable income" under the Chapter 13 Plan. They contend that the Personal Injury Funds "are not a future source of income." (Docket No. 41 at 11.) The implication is that the Personal Injury Funds (which were received pre-bankruptcy) are simply an asset in a Chapter 13 case.

      **c.**     **The Personal Injury Funds Need Not Be Used To Adjust "Projected Disposable Income."**

The Court appreciates the Chapter 13 Trustee's role in trying to make sure that the Debtors pay what they are obligated to pay under the Bankruptcy Code for the benefit of creditors. However, the Court concludes that the Debtors are not obligated to commit the Personal Injury Funds as "projected disposable income" in order to confirm their Third Chapter 13 Plan.

The Court's conclusion is mandated by the statutory framework. Under Section 1322(a)(1), a Chapter 13 plan must:

> provide for the submission of all or such portion of *future earnings* or other *future income* of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan.

11 U.S.C. § 1322(a)(1) (emphasis added). Notably, Congress used the word "future" twice.

When construing a statute, the Court employs a fair reading method that dictates the primacy of the statutory text. The inquiry must center on the "language of the statute itself." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). The starting place is the "plain" or "ordinary" meaning of the text. *Clark v. Rameker*, 573 U.S. 122, 126-27 (2014); *Lanning*, 560 U.S. at 513. And, the Court's duty is "to give effect, if possible, to every clause and word of a statute." *U.S. v. Menasche*, 348 U.S. 528, 538-39 (1955) (quoting *Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883)); *Lowe v. SEC.*, 472 U.S. 181, 207 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute.").

For this Court, the ordinary meaning of the word "future" is quite plain. It means something that has not yet occurred. According to the Supreme Court, dictionaries can help determine the ordinary meaning of words and phrases contained in the Bankruptcy Code. *Chicago v. Fulton*, 141 S. Ct. 585, 590 (2021) (using dictionaries to define words "act" and "exercise" in Bankruptcy Code); *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) (using dictionaries to define words "statement" and "respecting" in Bankruptcy Code); *Baker Botts L.L.P. v. ASARCO LLC,* 576 U.S. 121, 128 (2015) (using

dictionaries to define word "services" in Bankruptcy Code); *Clark*, 573 U.S. at 127 (using dictionaries to define words "retirement" and "funds" in Bankruptcy Code); *Ransom*, 562 U.S. at 69 (using dictionaries to define word "applicable" in Bankruptcy Code). One of the more prominent and popular United States dictionaries frequently referenced by the Supreme Court as authoritative defines "future" as "that is to be; still to come; what is going to happen." WEBSTER'S THIRD NEW INT'L DICTIONARY 926 (G. & C. Merriam Co. 1968). Other definitions of "future" are similar. AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 714 (Houghton Mifflin Harcourt 5th ed. 2011) ("future" means "the indefinite time to come; something that will happen in time to come; a prospective or expected condition"). There is no dispute that the Personal Injury Funds were received pre-petition, in the past. As such, they cannot fit within the definition of "future earnings" or "future income" at all. Instead, the Personal Injury Funds are a pre-petition asset of the Debtors. Generally, in Chapter 13 bankruptcy, debtors are permitted to retain their pre-petition assets so long as they commit to pay creditors out of future income and meet all the requirements of Section 1325. *See Viegelahn*, 135 S. Ct. at 1835 (Bankruptcy Code "allows a debtor to retain his property if he proposes, and gains court confirmation of, a plan to repay his debts over a three- to five-year period.").

Section 1325(b)(1) confirms the foregoing as well. If there is an objection to confirmation filed by "the trustee or the holder of an allowed unsecured claim," then the Court may not approve a contested Chapter 13 plan unless

> the plan provides that all of the debtor's *projected disposable income* to be received in the *applicable commitment period* beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

11 U.S.C. § 1325(b)(1)(B). The word "projected" in the phrase "projected disposable income" in Section 1325(b)(1)(B) is future-oriented, just like Section 1322(a)(1). *See Lanning*, 560 U.S. at 517-19. The term "applicable commitment period" also is a post-bankruptcy concept that "strongly favors the forward-looking approach." *Id.* at 517. Under the statutory definitions of "disposable income" and "current monthly income," the Debtors were obligated to "use past occurrences as a starting point" for determining "projected disposable income." *Lanning*, 560 U.S. at 520. And, the Debtors did so. They followed the statutory requirements exactly and ended up with "disposable income" and "current monthly income" on Forms 122C-1 and 122C-2 which did not include the Personal Injury Funds. After the agreed *Lanning* adjustments, the Debtors' "projected disposable income" is just $582.08. And, because the Personal Injury Funds were received pre-petition, they do not constitute a "projection" of additional funds to be received by the Debtors in the future.[8]

---

[8]    The Chapter 13 Trustee makes another temporal assertion that deserves short mention. He states: "While the [Chapter 13] Trustee cannot force the Debtors to spend the [Personal Injury] funds, the minute they do so, any of the funds become part of their income. The very action of using the funds for any expenses causes the funds be become part of the pool used to support the Debtors and thus relevant to the overall monies available for the payment of creditors." (Docket No. 45 at 3.) This is an odd argument that probably is directed primarily toward the exemption issue. However, the Court rejects it in the context of

Binding appellate precedent makes the same point. The Supreme Court has instructed courts to assess "projected disposable income" by starting with "disposable income" on Form 122C-2 and then, "only in unusual cases . . . go[ing] further and tak[ing] into account other known or virtually certain information about the *debtor's future income or expenses*." *Lanning*, 560 U.S. at 519 (emphasis added). Again, the focus is on the "future." Adjustments may be required, but only for changes in the Debtors' "future income or expenses." And, such changes need to be "known or virtually certain" at the time of Chapter 13 plan confirmation. Applying *Lanning* to the Personal Injury Funds, it is obvious that the amount of the Personal Injury Funds is "known or virtually certain." But that says nothing at all about the Debtors' "future income or expenses." So, the Personal Injury Funds are not "projected disposable income."

The Court cannot legislate and just make up a new requirement for confirmation of Chapter 13 plans. If a debtor is proposing to commit "all projected disposable income" to a Chapter 13 plan (and all other Section 1325(a) requirements are met), the Court, which has no authority to impose yet another demand on debtors, cannot deny confirmation. *See Baker Botts*, 576 U.S. at 134 (the Supreme Court "lack[s] the authority to rewrite the statute" even if it wishes for a different policy result). Under our constitutional framework, any new Chapter 13 confirmation requirements must be passed by Congress. If Congress wished to require Chapter 13 debtors to pony up some of their assets in addition to their "projected disposable income," Congress could have done so easily.[9]

But there is still another way to look at all this. Suppose that the Personal Injury Funds had been received by the debtor a day earlier on May 31, 2020. Under those circumstances (and leaving aside the exemption issue for the moment), Sections 101(10A), 1325(b)(1)(B), and 1325(b)(2) would have mandated that the Personal Injury Funds be added to the Debtors' other income during the CMI period: December 1, 2019 to May 31, 2020. Then, the Debtors' "disposable income" would have been inflated by $7,765.90 per month (*i.e.*, $46,595.45 ÷ 6 = $7,765.90). So, instead of $582.08 in "projected disposable income" based upon the agreed Form 122C-2 "disposable income" and the *Lanning* adjustment above, that figure would suddenly have jumped to $8,347.98 per month. It is undisputed that the Debtors could not pay that amount.

---

"projected disposable income." The Debtors can only receive the same income once. They received the Personal Injury Funds pre-bankruptcy on June 1, 2020. That is when they got the "income" (albeit such income did not qualify as CMI or "disposable income" under Sections 101(10A), 1325(b)(1)(B), and 1325(b)(2)). If the Debtors choose to spend the Personal Injury Funds in the future (which is their right), the use of the income they already received last year does not somehow convert the same money into new income. That is rather obvious. And, the Chapter 13 Trustee cites no authority holding otherwise.

[9]     The grand Chapter 13 bargain is that debtors generally may keep their assets while committing to pay future income to creditors. However, there are limits. Under Section 1325(a)(4), the Debtors must show that "the value . . . of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date . . . ." This is often referred to as the "best interest of creditors" test. In this case, it appears that the Debtors satisfy the Section 1325(a)(4) requirement especially since the Personal Injury Funds are exempt.

17

The foregoing scenario is similar to the facts of *Lanning*.  The *Lanning* debtor received a large "one-time buyout"[10] during the CMI period prior to the bankruptcy filing. That resulted in the debtor's "disposable income" being inflated.  There was "no dispute that respondent [the debtor] would in fact receive far less than" the inflated "disposable income" calculation yielded throughout the Chapter 13 plan term.  *Lanning*, 560 U.S. at 517-18.  The Supreme Court rejected a mechanical approach and instead focused on the future.  It was "known or virtually certain" that the *Lanning* debtor would not receive the "one-time buyout" again.  So, her "projected disposable income" properly could be adjusted to take the "one-time buyout" out of the equation.  In the end, the *Lanning* debtor was able to confirm her Chapter 13 plan without including the "one-time buyout" in the mix.  As applied to this case, *Lanning* dictates that even if the "one-time" Personal Injury Funds were part of "disposable income" under Sections 101(10A), 1325(b)(1)(B), and 1325(b)(2)(B), they still should not be included for purposes of "projected disposable income" because such approach would produce "senseless results" (*i.e.,* requiring the Debtors to pay into their plan $8,347.98 per month, an amount they cannot afford to pay). *See Lanning*, 560 U.S. at 520.

Notably, the Chapter 13 Trustee has come up with almost no legal authority supporting his position that a pre-petition asset outside of the CMI period must be given over to creditors.  He claims that "turnover of liquid pre-petition assets proves illusive in case law" because Chapter 13 cases with "large sums of cash on hand" are "not common practice . . . ."  Maybe.  This case does seem quite unique.  However, that is not a cogent reason why the Debtors must "turnover" their assets in addition to paying all their "projected disposable income."  In fact, other than *Lanning*, 560 U.S. at 505, the most analogous decision cited by both the Chapter 13 Trustee and the Debtors comes out against the Chapter 13 Trustee's position:  *In re Mobley*, 2011 WL 6812551 (E.D. Mich. Dec. 1, 2011).[11]  In *Mobley*, the debtor received $28,020.00 from a "personal injury settlement" about a month before the debtor filed for Chapter 13 bankruptcy protection. *Id*. at *1.  When she filed for bankruptcy, the debtor still had about $20,000.00 in a bank account which she claimed as exempt.  Similar to the Debtors here, the *Mobley* debtor proposed a Chapter 13 plan without committing any of the "personal injury settlement" funds to payment of creditors.  The Chapter 13 trustee objected for failure to include such funds as "disposable income."  *Id*.  The *Mobley* court, quoting *In re Brumm*, 344 B.R. 795, 802-03 (Bankr. N.D. W.Va. 2006), noted that "[t]he source of future [Chapter 13] plan payments is the debtor's future earnings or other future income . . . and the debtor is not required to commit pre-petition property to the repayment of pre-petition debts."  *Mobley*, 2011 WL 6812551, at *2.  Although the *Mobley* court did not mention *Lanning*, 560 U.S. 505, and did not explain all its rationale, the court ended up determining that the pre-petition "personal injury settlement" funds were not "disposable income" because "disposable income does not include prepetition property or its proceeds."  *Id*. at *2 (quoting *McDonald v. Burgie (In re Burgie)*, 239 B.R. 406, 410 (9th Cir. BAP 1999)).  So,

---

10    Many cases characterize *Lanning* as involving a "one time [pre-petition] bonus."  *See In re Arndt*, 2017 WL 5164141, at *26 n.30 (Bankr. N.D. Ohio Nov. 6, 2017); *In re Paliev*, 2012 WL 3564031, at *3 (Bankr. E.D. Va. Aug. 17, 2012).

11    Of course, the Chapter 13 Trustee has referred to many other cases concerning post-petition assets and income.  (Docket No. 45.)  But that is a different thing altogether.

the holding of the case with the most analogous fact pattern about personal injury settlement funds received pre-petition is contrary to the Chapter 13 Trustee's argument.

In the end, the Debtors are obligated to commit all of their "'projected disposable income' to be received in the applicable commitment period . . . [toward] payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B).  The Debtors met their burden to show that their "projected disposable income" is $582.08 per month.  So, they are required to pay unsecured creditors no less than $582.08 per month for 60 months.  That tallies to $34,924.80.  In the Third Chapter 13 Plan, the Debtors propose to pay unsecured creditors slightly more: $34,937.89.  So, the Debtors' have established that the Third Chapter 13 Plan satisfies the requirements of Sections 101(10A), 1325(b)(1)(B), and 1325(b)(2).

### 3.     The Exemption Issue.

The Debtors also have argued that the Personal Injury Funds need not be included as part of "projected disposable income" pursuant to Sections 101(10A), 1325(b)(1)(B), and 1325(b)(2) because the Personal Injury Funds are exempt under COLO. REV. STAT. § 13-54-102(1)(n).  This is another difficult legal issue over which some Bankruptcy Courts are divided.  The Debtors and the Chapter 13 Trustee dedicated most of their legal briefing to the exemption issue.  Last year, another division of the Court issued a cogent decision on the topic:  *In re Adamson*, 615 B.R. 303 (Bankr. D. Colo. 2020) (Rosania, B.J.).

However, given the Court's disposition above, there is no need for the Court to wade into the debate over "projected disposable income" and exemptions.  It is enough that the Court already has determined on other grounds that the Personal Injury Funds need not be included as part of "projected disposable income."  In the exercise of judicial discretion and economy, the Court declines to rule on the exemption issue raised by the Debtors.

### C.     The Good Faith Objection.

The Chapter 13 Trustee's only remaining substantive objection is that the Debtor has not proposed the Third Chapter 13 Plan in good faith under Section 1325(a)(3), which imposes a confirmation requirement that "the plan has been proposed in good faith and not by any means forbidden by law."  The Chapter 13 Trustee's good faith argument again focuses on the Personal Injury Funds.  He contends that the Debtors' Third Chapter 13 Plan was not proposed in good faith because the Debtors are not proposing to pay any of the Personal Injury Funds to creditors.  (Docket No. 40 at 1) ("The Debtors have the potential to pay substantially more to their creditors by agreeing to commit these [Personal Injury] funds to their Chapter 13 Plan, but they elect not to do so.").

Congress did not define the term "good faith" in Section 1325(a)(3).  However, within the jurisdiction of the Tenth Circuit Court of Appeals, the seminal appellate precedent on the good faith requirement for plan confirmation in Chapter 13 is: *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir. 1983).  In *Flygare*, the Tenth Circuit Court of Appeals announced a "totality of the circumstances" approach in which:

The bankruptcy court must utilize its fact-finding expertise and judge each case on its own facts after considering all the circumstances of the case.  If, after weighing all the facts and circumstances, the plan is determined to constitute an abuse of the provisions, purpose or spirit of Chapter 13, confirmation must be denied.

709 F.2d at 1347 (quoting *U.S. v. Estus (In re Estus)*, 695 F.2d 311, 316-17 (8th Cir. 1982)).  The Tenth Circuit adopted a list of eleven factors to be considered in the good faith analysis:

(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increases in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment between classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

(11) the burden which the plan's administration would place upon the trustee.

*Id.* at 1347-48 (quoting *Estus*, 695 F.2d at 317); *see also Mason v. Young (In re Young)*, 237 F.3d 1168, 1174-75 (10th Cir. 2001) (reconfirming *Flygare* factors for good-faith evaluation); *Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 668 (10th Cir. 1993) (same); *Pioneer Bank v. Rasmussen (In re Rasmussen)*, 888 F.2d 703, 704 (10th Cir. 1989) (same).  The *Flygare* list is "not exhaustive, and the weight given each factor will

necessarily vary with the facts and circumstances of each case." *Flygare*, 709 F.2d at 1348.

"The good faith determination is made on a case-by-case basis considering the totality of the circumstances. *Anderson v. Cranmer (In re Cranmer)*, 697 F.3d 1314, 1318-19 (10th Cir. 2012) (citing *Flygare*, 709 F.2d at 1347). Both parties agree that *Flygare* is applicable here. The *Flygare* decision pre-dates 2005 changes to the Bankruptcy Code — including to Sections 1325(b)(1)(B) and 1325(b)(2) — made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA"). However, even post-BAPCPA, the Tenth Circuit has confirmed the vitality of *Flygare*. The key post-BAPCPA decision is *Cranmer*, 697 F.3d 1314.

In *Cranmer*, the debtor presented a Chapter 13 plan based upon the exclusion of Social Security income ("SSI") from the projected disposable income calculation. The Chapter 13 trustee objected to confirmation on two grounds: (1) failure to commit all projected disposable income under Section 1325(b)(1); and (2) lack of good faith under Section 1325(a)(3). The bankruptcy court "concluded SSI must be included in the projected disposable income calculation and that [the debtor's] failure to do so showed he did not propose his plan in good faith." *Id.* at 1316. Thus, the bankruptcy court denied confirmation. The district court reversed and held that "SSI need not be included in the projected disposable income calculation and failure to include it did not show . . . bad faith." *Id.*

On further appeal, the Tenth Circuit sided with the district court and determined that SSI need not be included in the projected disposable income calculation. With respect to the Chapter 13 Trustee's good faith objection, the appellate panel endorsed *Flygare* and instructed:

> The good faith determination is made on a case-by-case basis considering the totality of the circumstances. *Flygare v. Boulden*, 709 F.2d 1344, 1347 (10th Cir. 1983). In evaluating a debtor's good faith, courts should consider eleven non-exclusive factors [from *Flygare*] as well as any other relevant circumstances.

*Id.* at 1318-19. However, after listing the *Flygare* factors, the Tenth Circuit recognized a "more narrow focus" for "good faith" inquiries post-BAPCPA. The appellate court stated:

> Since *Flygare* was decided, however, the Bankruptcy Code was amended to include 11 U.S.C. § 1325(b). . . . Section 1325(b)'s "'ability to pay' criteria subsumes most of the *Estus* factors" and, therefore, the good faith inquiry now "has a more narrow focus." . . . A bankruptcy court must consider "factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent

misrepresentation to mislead the bankruptcy court; or whether
he has unfairly manipulated the Bankruptcy Code."

*Id.* at 1319 n.5 (quoting *Educ. Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir. 1987)).  Turning to the facts in *Cranmer*, the Tenth Circuit rejected the Chapter 13 trustee's good faith objection, holding:  "When a Chapter 13 debtor calculates his repayment plan payments exactly as the Bankruptcy Code and the Social Security Act allow him to, and thereby excludes SSI, that exclusion cannot constitute a lack of good faith."  *Id.* at 1319.

With respect to the *Cranmer* factors, in this case, the Debtors stated their material debts and expenses accurately in their Statement of Financial Affairs and Schedules.  The Chapter 13 Trustee has not argued that the Debtors made any fraudulent misrepresentation to mislead the Court.  They have not.  Instead, the Court finds, based on the record, that the Debtors have been forthcoming and honest.  Finally, the Debtors have not unfairly manipulated the Bankruptcy Code.[12]  The Chapter 13 Trustee relies on his "projected disposable income" objections to negate the Debtors' good faith.  He insists that the Debtors must give their Personal Injury Funds to creditors because "[t]he guiding policy behind BAPCPA is that those who can afford to pay, do pay their creditors."  (Docket No. 40 at 5) (citing *Ransom*, 562 U.S. at 64).

However, the Court already has ruled in favor of the Debtors on the Personal Injury Funds Objection and determined that the Debtors' Third Chapter 13 Plan meets the requirements of Sections 101(10A), 1325(b)(1)(B), and 1325(b)(2) for commitment of all "projected disposable income."  Nothing more is necessary.  *See Cranmer*, 697 F.3d at 1319.  And, even if the general creditor-friendly policy behind BAPCPA was to have Chapter 13 debtors pay creditors more than prior to BAPCPA, that does not mean that such policy trumps the text of the Bankruptcy Code.  The Debtors simply are not required to pay more (as a sort of additional contribution or gift for creditors) than what the Bankruptcy Code mandates.  The Debtors need only commit all their "projected disposable income."  Since they propose to do exactly that, the Debtors have met their burden of showing that the Third Chapter 13 Plan was proposed in good faith under Section 1325(a)(3).

### D.   The Discrepancy Objection.

The Chapter 13 Trustee's Discrepancy Objection is not really substantive.  Instead, it is based upon what appears to be a typographical error.  There is a discrepancy

---

[12]    The timing of the Debtors' filing of their bankruptcy petition and the receipt of the Personal Injury Funds is interesting.  The Debtors received the Personal Injury Funds outside of the six-month period for calculating CMI.  Then they filed their bankruptcy case and claimed an exemption in those monies.  It is certainly possible that the Debtors planned their filing around the CMI-gap to preserve the exempt funds.  Such planning might merit additional scrutiny.  But there was no evidence of such planning or any wrongful conduct.  And, even if the Debtors had done so, in the absence of other evidence, the Tenth Circuit in *Cranmer* instructs:  "When a Chapter 13 debtor calculates his repayment plan payments exactly as the Bankruptcy Code . . . allow[s] him to, and thereby [properly] excludes [income that may be excluded] that exclusion cannot constitute a lack of good faith."  *Cranmer,* 697 F.3d. at 1319.

regarding payments to general unsecured creditors.  In Section 3.1D of the Third Chapter 13 Plan, the Debtors state that they propose to pay general unsecured creditors $26,937.89.  But in Section 3.2C of the Third Chapter 13 Plan, the Debtors indicate they will actually pay unsecured creditors $34,937.89.  The Court understands that the first number is an error and the Debtors really propose to pay $34,937.89 to general unsecured creditors.  However, the Discrepancy Objection is valid and the Debtors need to amend the Third Chapter 13 Plan to fix the problem.

### V.   <u>Conclusion</u>.

The Court has ruled on the Personal Injury Funds Objection and the Good Faith Objection overruling the Chapter 13 Trustee's position.  There remains only a minor impediment to confirmation.  The Debtors' Third Chapter 13 Plan contains some minor typographical discrepancies as noted in the Discrepancy Objection.  The Discrepancy Objection is valid but can be easily cured.

IT IS, THEREFORE, ORDERED:

1.   The Chapter 13 Trustee's Personal Injury Funds Objection and Good Faith Objection are OVERRULED.  The Chapter 13 Trustee Discrepancy Objection is SUSTAINED.

2.   The Debtors' Third Chapter 13 Plan (Docket No. 64) is DENIED as unconfirmable in its current form.

3.   By separate Order, the Court shall set a new schedule for the Debtor to submit an amended Plan conforming with terms of this Opinion and Order and curing the Discrepancy Objection.

DATED this 26th day of March 2021.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge

23